UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MRP PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 13-cv-00496-HE |
| | ) | |
| SENTINEL INSURANCE COMPANY LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT, SENTINEL INSURANCE COMPANY LIMITED'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

Gerard F. Pignato, OBA No. 11473
PIGNATO, COOPER, KOLKER & ROBERSON, P.C.
Robinson Renaissance Building
119 North Robinson Avenue, 11th Floor
Oklahoma City, Oklahoma 73102
Telephone: 405-606-3333
Facsimile: 405-606-3334
Email: jerry@pclaw.org
ATTORNEYS FOR DEFENDANT

April 9, 2014

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . ii

INTRODUCTION. . . . . 1

STATEMENT OF MATERIAL, UNDISPUTED FACTS. . . . . 3

ARGUMENTS AND AUTHORITIES. . . . . 20

**PROPOSITION I:**. . . . . 20
BAD FAITH STANDARD OF REVIEW : REASONABLENESS

**PROPOSITION II**: . . . . . 23
PLAINTIFF'S PUNITIVE DAMAGE CLAIM FAILS AS THE UNDISPUTED FACTS LACK EVIDENCE OF "RECKLESS DISREGARD"

## TABLE OF AUTHORITIES

### CASES

*Andres v. Oklahoma Farm Bureau*,
2009 OK CIV APP 97. . . . . 21

*Badillo v. Mid Century Ins. Co.,*
2005 OK 48, 121 P.3d 1080. . . . . 20,23

*Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.,*
2000 OK 55, 11 P.3d 162. . . . . 20

*Buzzard v. Farmers Ins. Co.*,
824 P.2d 1105 (Okla. 1991). . . . . 23

*Christian v. American Home Assur. Co.*,
522 P.2d 899, 1977 OK 141. . . . . 20

*Duensing v. State Farm Fire and Cas. Co*.,
2005 OK CIV APP 15, 131 P.3d 127. . . . . 21

*Frank v. Mayberry*,
1999 OK 63, 985 P.2d 773. . . . . 23

*Garnett v. Government Employees Ins. Co.*,
186 P.3d 935 (Okla. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lewis v. Farmers Ins. Co., Inc.*,
1983 OK 100, 681 P.2d 67. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lopez v. Farmers*,
2011 WL 1807158 (W.D. Okla.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,22

*McCorkle v. Great Atlantic Insurance Co.*,
1981 OK 128, 637 P.2d 583. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Narvarez v. State Farm Mut. Auto. Ins. Co.*,
1999 OK CIV APP 92, 989 P.2d 1051. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,21

*Roberts v. State Farm Mut. Auto. Ins.*,
61 Fed.Appx. 587 (10th Cir. 2003)(unpublished).. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rodebush by and through Rodebush v. Oklahoma Nursing Homes, Ltd.*,
1993 OK 160, 867 P.2d 1241.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sides v. John Cordes, Inc.*,
1999 OK 36, 981 P.2d 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Skinner v. John Deere Ins. Co.*,
2000 OK 18, 998 P.2d 1219. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**STATUTES**

Fed.R.Civ.P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

23 O.S. § 9.1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**OTHER AUTHORITY**

Local Rule 56.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OUJI-CIV-3d 22.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Defendant, Sentinel Insurance Company, Ltd. ("Sentinel"), moves this Court for Partial Summary Judgment, with respect to the bad faith claim and claim for punitive damages asserted by the Plaintiff, MRP Properties, LLC ("Plaintiff" or "MRP"), pursuant to Fed.R.Civ.P. 56, and Local Rule 56.1, because there is no genuine dispute over any material fact regarding these claims. The present Motion for Partial Summary Judgment does not address Plaintiff's breach of contract allegations.

## INTRODUCTION

MRP stands for Memorial Road Plaza and is located at 522 East Memorial Road in Oklahoma City, Oklahoma. It is owned by four members: Dale Odom, Deb Odom, Crystal Loden, and Woody Loden.

The present lawsuit arises from a May 29, 2012 hail storm. MRP claims its roof was damaged in that storm. The flat tar-and-gravel roof on this plaza was the original roof installed 25 years earlier when the Plaza was built. It had survived several severe hail storms over the years, and many repairs had been attempted to stop numerous roof leaks. As explained below, this roof suffered a severe hail storm on May 16, 2010, prior to the inception of the Sentinel policy,[1] and a second severe hail storm on May 23, 2011, a year before the May 29, 2012 hail storm giving rise to the present lawsuit.

On May 29, 2012, MRP experienced a third known hail storm event which caused damage to the parapet wall, flashing, and to several of the air conditioning units. At the time

---

[1]The Sentinel policy became effective on June 1, 2010.

of this storm, MRP was insured under a policy of insurance issued by Sentinel. Sentinel conducted a prompt investigation of Plaintiff's claim and determined that Plaintiff's tar-and-gravel roof, while old and deteriorated, had not been damaged by the May 29, 2012 storm. It should have been replaced years earlier. With respect to a portion of Plaintiff's roof that Sentinel did determine had been damaged by the May 29, 2012 hail storm (*e.g.*, the parapet walls, flashing, and air conditioning units), Sentinel paid Plaintiff for that damage in the total amount of $56,520.20, on an RCV basis.

In September 2012, after Sentinel had made its coverage determination, Plaintiff paid its chosen roofer, Mustang Roofing, $34,032.00 to replace the east one/third of the roof with a new TPO roof system. The TPO roof system has been described by Plaintiff's own witnesses as state-of-the-art, the best available. As an added bonus, the TPO system costs less than the tar-and-gravel roof that MRP had. In addition, Plaintiff used the money paid by Sentinel which was intended to *repair* several of the damaged AC units to *purchase* four new, larger AC units.

Plaintiff filed the present lawsuit on April 24, 2013, and asserted claims against Sentinel for breach of contract and bad faith in connection with Sentinel's handling of Plaintiff's claim arising from the May 29, 2012 hail storm. Plaintiff also seeks punitive damages.

Two days later, on April 26, 2013, another hail storm passed through the Oklahoma City/Edmond area. MRP suffered another loss and made another roof/hail claim to Sentinel. Sentinel promptly inspected the roof and determined that the west two-thirds of the roof had

been damaged by this hailstorm (or as a cumulative effect of all the previous hail storms) sufficient to warrant replacement of the remaining two-thirds of the roof. MRP requested the same TPO system. The TPO system installed on the east one-third of the roof in September 2012 was undamaged by the hail on April 26, 2013, and thus, Sentinel did not agree to replace that portion of the roof.[2] Ultimately, Sentinel paid a total of $200,470.83 to Plaintiff on June 11, 2013, in connection with Plaintiff's loss sustained as a result of the April 26, 2013 hail storm.

As demonstrated below, the problems with this roof pre-dated the hail storm of May 29, 2012. This roof required a replacement in 2010, and probably sooner. MRP undertook many repairs of this roof since it purchased the plaza in 2005. As the facts in this case have developed, it has become clear that the members of MRP recognized the need for a new roof and tried to persuade an insurance company to pay for it. Dale Odom saw that other buildings near his replaced their roofs in 2010 and 2012, and he decided that MRP should therefore also get a new roof, without expense to MRP.

## Statement of Material, Undisputed Facts

In order to properly understand the issues in the present Motion for Partial Summary Judgment, it is necessary to first understand the history of hail storms that affected MRP before and after May 29, 2012. Thus, the undisputed facts, below, are arranged by way of storm.

---

[2]MRP does not claim the TPO system on the east one-third of the roof should have been replaced following the April 26, 2013 storm.

- ***The following Undisputed Fact Nos. 1-16, relate to the hail storm of May 16, 2010.***

1. MRP's member, Crystal Loden recalls that the May 16, 2010, hail storm was significant. (Depo of C. Loden, p. 34, **EXHIBIT 1**.)

2. Max Pope is one of Plaintiff's listed witnesses in this case. He is the president of Southwestern Roofing. He remembers the May 16, 2010 hail storm that "would have hit this building with softball-size hail." (Depo. of Max Pope, pp. 14-16, **EXHIBIT 2**.)

3. Southwestern Roofing repaired or replaced the roofs of several commercial buildings near MRP following the May 16, 2010 storm. (Depo. of M. Pope, p. 18, **EXHIBIT 2**.)

4. Deb Odom acknowledged that a hail claim was submitted by MRP to its insurer, CNA, as a result of the May 16, 2010 hail storm. Although she mistakenly testified that the claim was submitted in 2011 and related to a 2011 hail storm, the CNA claim file confirms the claim was submitted in connection with the May 16, 2010 hail storm. (Depo. of Deb Odom, pp. 27, 30-31, **EXHIBIT 3**.)

5. The claim file provided by CNA (actual underwriting company was Valley Forge Insurance Company) pursuant to Sentinel's Subpoena *Duces Tecum* reflects MRP submitted a roof/hail claim to CNA as a result of the May 16, 2010 hail storm. There are more than 300 pages in the CNA claim file, including the Rimkus Report, dated July 26, 2010. (Rimkus Report, dated July 26, 2010, **EXHIBIT 4**.)

6. The Rimkus Report summarizes statements made by Dale Odom in which he attributed the roof damage and water leaks into the retail spaces of the building to the May 16, 2010 hail storm. Rimkus disagreed. (Rimkus Report, dated July 26, 2010, **EXHIBIT4**.)

7. On August 6, 2010, CNA wrote to MRP and denied its claim, stating that CNA's "investigation determined that there was no wind or hail damage to the built-up roof." (CNA letter, dated August 6, 2010, **EXHIBIT 5**.)

8. Tony Gore ("Gore") is another witness listed by Plaintiff in this case. He is a roofer employed by Mustang Roofing who inspected Plaintiffs' roof immediately after the May 16, 2010 hail storm.[3] (Depo. of T. Gore, pp. 11-13, 26-31, 34-36, 57, **EXHIBIT 6**.)

9. Gore confirmed in his deposition that the roof was the original roof and was approximately 25 years old. (Depo. of T. Gore, p. 12, **EXHIBIT 6**.)

10. Gore attributed a substantial amount of damage to the roof as a result of the 2010 hail storm, and believes the roof should have been replaced at that time. (Depo. of T. Gore, p. 11, **EXHIBIT 6**.)

11. Gore explained that a tar-and-gravel roof, like the type of roof MRP had, is particularly difficult to damage by hail. Nonetheless, he insisted to CNA that the 2011 (*i.e.*, 2010) hail storm damaged MRP's roof and required a new roof. (Depo. of T. Gore, pp. 11-13, **EXHIBIT 6**.)

---

[3]Like Deb Odom, he is also confused on the year. In his deposition, he repeatedly referenced a 2011 claim submitted to CNA, but the undisputed fact is, MRP did not submit a roof/hail claim to any insurance company in 2011 and Gore did not inspect the MRP roof in 2011.

12. Gore testified he met with an insurance adjuster following the 2011 hail storm, but MRP did not make a roof/hail claim in 2011. Sentinel had the coverage in 2011 and MRP did not submit a roof/hail claim to Sentinel in connection with the 2011 hail storm. Again, Gore was obviously referring to the 2010 hail storm and the claim made by MRP to CNA at that time.[4] For example, Gore testified:

> Q: Do you recall the name of the insurance company?
>
> A: Not at the time, no.
>
> Q: If I mention a name, do you think it might refresh your memory?
>
> A: A possibility.
>
> Q: CNA?
>
> A: Yes.
>
> * * *
>
> Q: What was your purpose or responsibility?
>
> A: To come out there to see if they have any hail damage to their roof, particular roof system, because they had had hail the week before out there on that particular system. And he had approximately twenty-five to fifty leaks inside the building that he showed me.
>
> Q: So you got up there on the roof with him?
>
> A: I didn't get with Dale. I met his insurance adjuster.
>
> Q: Up on the roof?

---

[4]At the time Gore's deposition was taken, January 21, 20114, Sentinel's counsel had not yet obtained a copy of the CNA claim file to confirm that Gore inspected MRP's roof following the May 16, 2010 storm, and not a 2011 hail storm.

A: Up on the roof. The first time I come out myself personally and looked over the roof before I met the insurance adjuster.

Q: So you went out there actually twice?

A: Yes, sir.

Q: What did you find when you went up there?

A: Hail damage.

Q: Tell me how you saw hail damage? Where was it? What did it look like?

A: Well, there was holes in the flashing, all the metal cap was dented up, all the PVC caps was crushed, the ACs had core damage. There was areas on the gravel roof where it spread the gravel, and you could see where the hail hit the felts and damaged the felt. Also, I would take that as a powerful storm, because the whole alley was full of gravel at that time, that Odom and them had to hire somebody to clean up. That means you had a driving hail that knocked that gravel that covered that alley.

Q: You are saying the hail was so severe that it knocked the gravel off the roof into the alley below?

A: The whole alley was full of gravel, yes, sir. It's very seldom that you see that. It takes a powerful storm to do that.

Q: That was the 2011 storm?

A: That was the 2011 storm (again, referring to the 2010 storm).

* * *

> Q: Were your conversations regarding that 2011 claim primarily with Dale Odom?
>
> A: Yes.
>
> Q: When I say primarily, on behalf of MRP, they were with Dale?
>
> A: Yes.

(Depo. of T. Gore, pp. 26-28, 31, **EXHIBIT 6**.)

13. Gore testified at length that he provided MRP two bids following the 2011 (*i.e.*, 2010) hail storm: One for replacement of the roof with the same tar-and-gravel system and one for a replacement with a TPO system. (Depo. of T. Gore, pp. 34-36, **EXHIBIT 6**.)

14. CNA took the position that the roof leaks at that time were related to normal wear and tear, and unrelated to the recent hail event. Thus, CNA denied the claim and the roof did not get repaired or replaced at that time. (CNA letter, dated August 6, 2010, **EXHIBIT 5**.)

15. The claim file produced by CNA pursuant to Sentinel's Subpoena *Duces Tecum* contained a written bid by Gore, dated June 15, 201**0**, to replace the roof, in the amount of $161,366.00. (Gore bid, dated June 15, 201**0**, **EXHIBIT 7**.)

16. The air conditioning units on the roof were also damaged during the 2010 hail storm, and they had not been repaired or replaced prior to the May 29, 2012 hail storm. Gore testified:

> Q: Do you know whether or not the air-conditioning units had ever been repaired or replaced following the ~~2011~~ 2010 hailstorm?

A: I don't think so. They still had damage on them.

(Depo. of T. Gore, p. 57, **EXHIBIT 6**.)

- ***The following Undisputed Fact Nos. 17 -32 are related to the May 29, 2012 hail storm.***[5]

17. Following the May 29, 2012 hail storm, none of the members of MRP disclosed to Sentinel the 2010 roof/hail claim to CNA. (Affidavit of Wayne Folmer, **EXHIBIT 8**.)

18. Over the years, Dale Odom hired family/church friend, Mike Shields ("Shields"), to undertake some of the air conditioning repairs needed on MRP's roof. Shields is self-employed in the air conditioning/ refrigeration business and began working at the Memorial Road Plaza for the Odoms in approximately 2005 when they bought it. (Depo. of M. Shields, p. 23, **EXHIBIT 9**.).

19. Sentinel hired HVACi, experts in commercial air conditioning systems, to inspect the air conditioning units on MRP's roof. That inspection took place on or about June 28, 2012. Based on the on-sight inspection, it was HVACi's opinion that the primary cause of damage to 10 of the 21 HVAC systems evaluated was hail. HVACi recommended that the 10 damaged units be repaired. Its report stated: **"Our findings indicate that repairs would sufficiently restore the HVAC system back to normal operation and the insured to pre-loss condition. Thus, a full replacement of the HVAC systems is not required."** HVACi estimated the cost of repairs at $23,867.95, and Sentinel paid that

[5]There are two components of MRP's claim arising from the May 29, 2012 hail storm: (1) the air conditioning units, and (2) the roof.

amount in three payments directly to MRP. (HVACi Report, dated July 9, 2012, **EXHIBIT 10**.)

20. In the present lawsuit, MRP contends that at least four of the air conditioning units were completely destroyed during the May 29, 2012 hail storm and should have been replaced with new units. Dale Odom acknowledges he knows very little about air conditioning units or roofs,[6] yet he contacted Shields and instructed Shields to bid on the purchase of new air conditioning units. In other words, Dale Odom did not ask Shields to offer an opinion on whether the May 29, 2012 hail storm totaled some of the existing air conditioning units; rather, Dale Odom made the unilateral decision that four new air conditioning units would be purchased, and that Sentinel would pay for them, and he instructed Shields to submit a bid for them. (Depo. of M. Shields, pp. 45-46, 60-61, **EXHIBIT 9**.)

21. Shields also explained that when Dale Odom instructed him to replace four of the original three-ton air conditioning units, they were replaced with brand new five-ton machines, *i.e.*, an upgrade, at a cost of $26,500. In other words, MRP applied the $23,867.95 paid by MRP toward four new AC units at a cost of $26,500. (Depo. of M. Shields, pp. 44-46, 64-65, **EXHIBIT 9**.)

22. Dale Odom argued several times in his deposition that MRP should have been given a new roof by Sentinel because other commercial structures in the close vicinity of

[6]See Undisputed Fact No. 42.

MRP got new roofs. Dale Odom knows nothing about those other roofs (*e.g.*, their age, condition, type of roof, *etc.*). (Depo. of Dale Odom, pp. 82-84, **EXHIBIT 11**.)

23. Dale Odom made similar statements to Shields:

> Q: Did he tell you why he was going to sue?
>
> A: He was indicating to me that the insurance company didn't want to pay for the roof and it was his argument that all of the roofs around that particular property had a new roof on them and indicated to me that if they all got a new roof, he should get a new roof.

(Depo. of M. Shields, pp. 56-57, **EXHIBIT 9**.)

24. Immediately following the May 29, 2012 hail storm, MRP submitted a claim to Sentinel for alleged damage to its roof. Because this hailstorm had been classified as a CAT event, Sentinel dispatched Allcat Claims Service ("Allcat"), a national claims service, from Boerne, Texas, that specializes in CAT losses all across the country. Allcat assigned this claim, as well as other Oklahoma claims arising from the same storm, to Wayne Folmer ("Folmer"). Folmer inspected MRP's roof on June 7, 2012. (Affidavit of W. Folmer, **EXHIBIT 8**.)

25. As of June 7, 2012, when he inspected MRP's roof, Folmer had inspected over 100 flat tar-and-gravel roofs, residential and commercial. The more damage he identified related to a particular loss, the more money he makes. If he determines a roof should be replaced as a result of a hail storm, he makes more money than he would by opining that the damage to the roof was not caused by the hail storm. He has a financial incentive to find damage and to relate it to the weather event. (Affidavit of W. Folmer, **EXHIBIT 8**.)

26. Folmer found obvious damage to the parapet walls, flashing, vent caps, and air conditioning covers (from the May 29, 2012 storm and previous storms), but he saw no evidence of damage to the tar-and-gravel roof field *caused by the May 29, 2012 hail storm*. The damage to the tar-and-gravel roof field that Folmer saw was related to years of wear and tear, and damage caused by previous hail storms (such as the hail storm in 2010 that resulted in the same type of claim to CNA). (Affidavit of W. Folmer, **EXHIBIT 8**; Allcat Report, **EXHIBIT 8A**.)

27. MRP's roofer, Gore, was asked to inspect the roof again following the May 29, 2012 hail storm, and he took the position that the damage to the roof was caused by the May 29, 2012 hail storm and required a complete replacement. In other words, he expressed the same opinion that he had previously expressed following the May 16, 2010 hail storm. (Depo. of T. Gore, p. 57, **EXHIBIT 6**.)

28. Accordingly, Sentinel hired Donan Engineering Company ("Donan") to further inspect MRP's roof. Donan has an Oklahoma City office. Donan inspected MRP's roof on July 2, 2012. Present at the time was Dale Odom and another representative of Mustang Roofing. Donan noted in its report, based on statements made by Dale Odom, that the leaks started about one and a half years earlier,[7] and that some of the leaks are new and had occurred since the May 29, 2012 hail storm. Donan also pointed out that "gravel-surfaced built-up roofs are rarely damaged by hail in the field of the roof areas." (Donan Report, dated July 11, 2012, **EXHIBIT 12**.)

[7] In fact, the leaks began much earlier than that.

29. Donan concluded its report as follows:

- The cause of water intrusion is age deterioration of the built-up roof system, edge detailing at gutter flashing repairs, and poor drainage of the low sloping roof.

- Evidence of one and a half inch diameter hail impacts were found in the form of roof vent dents, damaged air conditioner condenser fins, and clean spots on roof top units.

- Any hail that has impacted this roof was of insufficient mass and/or velocity to compromise the integrity and functionality of the built-up roof or the modified bitumen membrane.

- No hail damage was found to the built-up roof or modified bitumen membrane.

- Hail damage was found on the age-deteriorated and unsupported parapet wall flashing.

(Donan Report, dated July 11, 2012, **Exhibit 12**.)

30. MRP retained Michael Herndon of Herndon Engineering in Tulsa who performed yet another inspection of Plaintiff's roof on September 24, 2012. Herndon determined that the cause of the damage to the roof and various water leaks was the May 29, 2012 "significant hail storm [that] passed through the area causing extensive damage to surrounding buildings and automobile dealerships." (Herndon Report, dated September 24, 2012, **Exhibit 13**.)

31. On September 26, 2012, Gore of Mustang Roofing replaced the east one-third of the roof with a TPO system, at MRP's expense. Mustang Roofing invoiced MRP the total amount of **$34,032.00**. (Depo. of T. Gore, pp. 48-49, **Exhibit 6**; Mustang Roofing Invoice, dated September 26, 2012, **Exhibit 14**.)

32. Dale Odom continued to complain to Sentinel about its coverage position, so Sentinel retained JM Building and Roofing Consultants to conduct yet another inspection of the roof on November 19, 2012. Present at the time were Dale Odom, Woody Loden, a representative of Mustang Roofing, and Mike Schroeder and David Lowrey of Donan. MRP decided not to have Michael Herndon present.[8] Three core samples were removed at that time. While removing these samples, no evidence of water was seen. The MRP owners and their roofer were asked to point out what they believed was roof damage to the field of the roof. After extensive searching, no damage to the field of the roof was found. The core samples were tested for water permeability and impact damage to the system. There was no indication of either in the samples. JM Building concluded that hail did not shorten the life cycle of the field of this roof. (JM Building Report, dated January 4, 2013, **Exhibit 15**.)

- ***The following Undisputed fact Nos. 33 - 41 are related to the April 26, 2013 hail storm.***

33. MRP filed the present lawsuit on April 24, 2013. Two days later, on April 26, 2013, another significant hail storm passed through the Oklahoma City/Edmond area, and directly impacted MRP. (Affidavit of K. Moore, **Exhibit 16**.)

34. The hail size recorded by Weather Fusion, LLC at the MRP location on this date was up to 2.5 inches in diameter. (Weather Fusion Report, **Exhibit 17**.)

35. In fact, the hail storm was so severe that it set off the security alarm on the building. (Depo. of Deb Odom, p. 105, **Exhibit 3**.)

---

[8]In an email to Sentinel dated December 5, 2012, Michael Jazdzyk of JM Building stated: "I have been on this roof, met with the insured and the engineers from Donan. The owners chose not to have their engineer present." (Sentinel Email, dated December 5, 2012, **Exhibit 18**.)

36. Once again, MRP promptly made a claim to Sentinel, claiming that the April 26, 2013 hail storm caused damage to the roof which resulted in water leaks to the interior retail spaces. (Affidavit of K. Moore, **Exhibit 16**.)

37. Sentinel assigned the handling of this claim to its regional adjuster, Kyle Moore ("Moore"). Moore inspected the roof and saw obvious hail damage again to the parapet walls, flashing, vent caps, and air conditioning fins. Due to the water leaks and cumulative effect of the damage that had occurred over the years to the roof, Moore decided to replace the remaining two-thirds of the roof. (Affidavit of Kyle Moore, **Exhibit 16**.)

38. Moore's original RCV estimate was $183,062.87, and he later increased his estimate to $200,470.83. Moore's estimate is broken down as follows:

| | |
|---|---|
| Roofing (built-up roofing, gravel ballast, and gravel stop) | $ 72,364.05 |
| Insulation removal | 4,782.04 |
| New insulation | 24,954.54 |
| Flashing (cap flashing and pipe jack) | 14,164.75 |
| Furnace vent (rain cap and storm collar) | 146.68 |
| HVAC system | 30,009.11 |
| Interior (ceiling tiles, acoustical treatment installer) | 109.11 |
| Plaster patch/exterior seal and paint | 3,107.70 |
| Adjustments for base charge services | 424.04 |
| Overhead | 15,006.21 |
| Profit | 15,006.21 |
| Material sales tax | 2,987.42 |

(Affidavit of Kyle Moore, **EXHIBIT 16**.)

39. MRP has no complaints about the way Sentinel handled and adjusted its claim arising from the April 26, 2013 hail storm. (Depo. of Deb Odom, p. 120, **EXHIBIT 3**.)

40. MRP then used Sentinel's money to hire Mustang Roofing again to replace the remaining two-thirds of the roof with the same TPO roof system. Mustang Roofing charged MRP **$66,880.00** to replace the remaining two-thirds of the roof, and Dale Odom paid **$7,000.00** to another company to remove the loose gravel from the remaining two-thirds of the roof. (Depo. of Tony Gore, pp. 61-63, **EXHIBIT 6**.)

41. It is unclear whether and/or to what extent MRP used the remaining Sentinel money to make repairs on its roof.

- ***The following additional Undisputed Fact Nos. 42-56 further support Sentinel's Motion for Summary Judgment with respect to Plaintiff's bad faith claim.***

42. Dale Odom acknowledges he is not a roofer and knows little about roofing. (Depo. of Dale Odom, p. 21, **EXHIBIT 11**.)

43. Deb Odom acknowledges she does not consider herself a roof expert or an expert on adjusting hail losses, and would defer to others. (Depo. of Deb Odom, p. 68, **EXHIBIT 3**.)

44. Woody Loden is likewise not a hail expert and does not know how to determine whether or not there is damage to a roof. (Depo. of W. Loden, p. 18, **EXHIBIT 19**.)

45. Crystal Loden handles MRP's insurance claims, and was responsible for the submission of the roof/hail claim to Sentinel following the May 29, 2012 hail storm. She

spoke on the phone with Sentinel's Aurora, Illinois-based claims adjuster, Patrick Natale, several times regarding the claim arising from the May 29, 2012 storm. She described Patrick Natale as polite and courteous, and acknowledged he was generally available when she called. Additionally, Patrick Natale took the initiative to call her on his own with updates. (Depo. of C. Loden, pp. 37-42, **Exhibit 1**.)

46. Crystal Loden has never been up on the MRP roof. (Depo. of C. Loden, p. 42.)

47. Deb Odom identified a photograph taken on June 7, 2012 approximately one week after the May 29, 2012 hail storm, that accurately depicts the MRP tar-and-gravel roof. (Depo. of Deb Odom, pp. 77-78, **Exhibit 3**; photograph of the tar-and-gravel roof, attached as Exhibit 2 in Deb Odom's deposition, **Exhibit 20**.)[9]

48. Deb Odom identified a closeup photograph of the MRP tar-and-gravel roof taken on June 7, 2012. (Depo. of Deb Odom, p. 80 **Exhibit 3**; photograph of the tar-and-gravel roof, attached as Exhibit 3 in Deb Odom's deposition, **Exhibit 21**.)

49. Deb Odom identified a photograph of the MRP roof taken on June 7, 2012, that shows repairs made to the roof prior to May 29, 2012, using a modified bitumen material. (Depo. of Deb Odom, pp. 82-83, **Exhibit 3**; photograph showing repairs to the tar-and-gravel roof, attached as Exhibit 5 in Deb Odom's deposition, **Exhibit 22**.)

50. Deb Odom also identified another photograph taken on June 7, 2012, that shows another section of the MRP roof that had been previously repaired by using a modified

[9] A hard copy of Sentinel's Motion for Summary Judgment will be hand-delivered to this Court, and it will contain color copies of the photographs.

bitumen material. (Depo. of Deb Odom, pp. 83-84, **EXHIBIT 3**; photograph of the tar-and-gravel roof, attached as Exhibit 6 in Deb Odom's deposition, **EXHIBIT 23**.)

51. Crystal Loden identified an aerial photograph of the Memorial Road Plaza taken on October 12, 2011. The roof shows a repair made "because of leaks" using a modified bitumen material. (Depo. of C. Loden, pp. 49-50, **EXHIBIT 1**; photograph of the tar-and-gravel roof, attached as Exhibit 19 in Crystal Loden's deposition, **EXHIBIT 24**.)

52. Crystal Loden identified another aerial photograph of the Memorial Road Plaza taken on August 20, 2012, which shows additional repairs using the same modified bitumen material. Ms. Loden does not know if these additional repairs were made before May 29, 2012. (Depo. of C. Loden, pp. 51-52, **EXHIBIT 1**; photograph of the tar-and-gravel roof, attached as Exhibit 20 in Crystal Loden's deposition, **EXHIBIT 25**.)

53. The TPO System MRP chose to install on the east one-third of its roof in September 2012 and on the remaining two-thirds of its roof following the April 2013 hail storm is considered by experienced roofers as "the most present system on the market today that everybody is using" and is described as state-of-the-art. (Depo. of T. Gore, pp. 9-10, **EXHIBIT 6** .)

54. Sentinel issued the Hartford Spectrum Business Insurance Policy, Special Property Coverage Form, Policy No. 38 SBA TO789898, for the period of June 1, 2011 through June 1, 2012, to MRP Properties, LLC. (Certified copy of Sentinel Policy issued to Plaintiff, **EXHIBIT 26**.)

55. By its policy, Sentinel agrees to pay for direct physical loss of or physical damage to covered property at the premises described in the Declarations caused by or resulting from a "Covered Cause of Loss." Normal wear and tear and/or damage caused by previous storms prior to the inception of the Sentinel policy are not covered causes of loss. (Sentinel Policy, pp. 1-2 of 25, **EXHIBIT 26**.)

56. In addition, the relevant exclusions in the policy state:

> **B. EXCLUSIONS**
>
> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> * * *
>
> g. **Neglect.**
>
> Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.
>
> 2. We will not pay for physical loss or physical damage caused by or resulting from:
>
> * * *
>
> c. **Miscellaneous Types of Loss.**
>
> (1) Wear and tear

(Sentinel Policy, pp. 16-17 of 25, **EXHIBIT 26**.)

## ARGUMENTS AND AUTHORITIES

### PROPOSITION I: BAD FAITH STANDARD OF REVIEW: REASONABLENESS.

The Oklahoma Supreme Court first recognized the tort of bad faith in *Christian v. American Home Assur. Co.*, 577 P.2d 899, (Okla. 1977). "[A]n insurer has an implied duty to deal fairly and act in good faith with its insured and . . . the violation of this duty gives rise to an action in tort." *Id.* at 904. The duty of good faith does not require an insurer to pay every claim made by an insured, even if there is evidence supporting the insured's claim.

> We recognize that there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions. Resort to a judicial forum is not per se bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit. Rather, tort liability may be imposed only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured.

*Id.* at 905. Thus, an insurer's failure or refusal to tender payment must be unreasonable and in bad faith in order to be actionable. *See also, Badillo v. Mid Century Ins. Co.,* 2005 OK 48 ¶ 28, 121 P.3d 1080, 1093 ("[t]he essence of an action for breach of the duty of good faith and fair dealing 'is the insurer's unreasonable, bad-faith conduct'"); *Skinner v. John Deere Ins. Co.*, 2000 OK 18, ¶ 17, 998 P.2d 1219, 1223 (recognizing that insurer "acted reasonably as a matter of law and, thus, summary judgment was proper"); *Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.,* 2000 OK 55 ¶21, 11 P.3d 162, 171 ("a decision to withhold or delay payment, if based on a legitimate dispute or reasonable justification (legal or factual) cannot form the basis of bad faith tort liability"; *Narvarez v. State Farm Mut. Auto. Ins. Co.,* 1999

OK CIV APP 92 ¶13, 989 P.2d 1051, 1053 (citing *McCorkle v. Great Atlantic Insurance Co.*, 1981 OK 128, 637 P.2d 583) ("The essence of the tort of bad faith, as it is recognized in Oklahoma, is the unreasonableness of the insurer's actions"); *Duensing v. State Farm Fire and Cas. Co.*, 2005 OK CIV APP 15 ¶41, 131 P.3d 127, 138; *Andres v. Oklahoma Farm Bureau*, 2009 OK CIV APP 97 (the insurer did not act unreasonably or in bad faith in its decision to litigate the claim).

It is also important to understand that "reasonableness," in the bad faith context, is "more than simple negligence." *Badillo* at 1094. This point was recently amplified by the Oklahoma Supreme Court when it held that "a party prosecuting a claim of bad faith carries the burden of proof and must plead all of the elements of an intentional tort." *Garnett v. Government Employees Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008) (Emphasis added). The Court in *Garnett* also held:

> The essence of the (intentional) tort is the unreasonable, bad faith conduct of the insurer. A central issue is whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are alleged to be violative of the duty of good faith and fair dealing. Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious. It is not a breach of the duty of good faith for an insurer to resort to a judicial forum to settle legitimate disputes as to the **validity** or **amount** of an insurance claim.

*Garnett* at 944. (Emphasis added.)

This Court analyzed a similar roof/hail claim in the case of *Lopez v. Farmers*, CIV-10-0584-HE, in which the court granted Farmers' Motion for Summary Judgment with respect

to Plaintiff's bad faith claim. *See*, 2011 WL 1807158 (W.D. Okla.). In *Lopez*, the insured's roof was approximately 18 years old at the time of the hail storm. Farmers assigned an adjuster to inspect the plaintiff's roof and the interior. She noted extreme wear/tear to the roofing surface, and determined that the source of the interior water damage was likewise wear/tear. The adjuster took photographs during her inspection of the roof and of the interior water damage – just as Wayne Folmer did in the present case. She prepared an estimate of the amount of money necessary to replace the property she determined was damaged by the hail – two exhaust caps. Lopez' roofer was present during Farmers' adjuster's inspection of the roof, and he disagreed with the adjuster's conclusions. Based on these facts, this court dismissed Lopez' bad faith claim. The facts in *Lopez* are strickingly similar to the facts in the present case.

There is no such thing as a perfect claim file or a perfect claim investigation. The Plaintiff/insured will always be able to point to some imperfections in the insurer's handling of any claim. (Affidavit of Kyle Moore, **EXHIBIT 16**.) However, an insurer's investigation need not be perfect, just reasonable. *Roberts v. State Farm Mut. Auto. Ins.*, 61 Fed.Appx. 587, 591-92 (10th Cir. 2003)(unpublished).

The Oklahoma Supreme Court has made it clear that bad faith is an intentional tort, and that to succeed on such a theory, the insured's claims must be predicated upon a clear showing that the insurer's conduct was not only unreasonable, but was also motivated by bad faith. *Lewis v. Farmers Ins. Co., Inc.*, 1983 OK 100, ¶7, 681 P.2d 67. Thus, to prove a *prima facie* case of bad faith against Sentinel, Plaintiff must establish more than just a

mistake or negligence. Instead, Plaintiff must come forward with evidence from which a reasonable jury could conclude that Sentinel's handling of Plaintiff's claim was unreasonable, in bad faith, and *motivated by bad faith*. Plaintiff cannot meet its burden of proof in this case, and accordingly, summary judgment must be granted in favor of Sentinel with respect to Plaintiff's bad faith claim.

**PROPOSITION II: PLAINTIFF'S PUNITIVE DAMAGE CLAIM FAILS AS THE UNDISPUTED FACTS LACK EVIDENCE OF "RECKLESS DISREGARD."**

In the event Plaintiff's bad faith claim survives summary judgment, this Court should still grant judgment in Sentinel's favor on Plaintiff's claim for punitive damages because there is no evidence Sentinel acted with "reckless disregard" in its handling of Plaintiff's claims. Whether an award of punitive damages is permissible is a question of law for the trial court in the first instance and the issue of punitive damages may not be submitted to the jury unless sufficiently supported by the evidence. *Frank v. Mayberry*, 1999 OK 63, 985 P.2d 773, 777 ("The issue of whether the record contains enough evidence to justify a punitive damages award is a question of law."); *Sides v. John Cordes, Inc.*, 1999 OK 36, 981 P.2d 301, 305 ("These threshold rulings [on punitive damages] present issues of law for the trial judge."); *Rodebush by and through Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241, 1250 (Oklahoma's punitive damages statute "requires a preliminary determination before the question can even be considered by the jury.").

A jury may not award punitive damages unless it finds by clear and convincing evidence that "an insurer has recklessly disregarded its duty to deal fairly and act in good

faith with its insured." 23 O.S. § 9.1(B)(2). Upon such a finding, the jury may only award punitive damages in an amount not to exceed the greater of $100,000 or the amount of actual damages awarded. *Id.* If a jury finds by clear and convincing evidence that "an insurer intentionally and with malice breached its duty to deal fairly and act in good faith with its insured, the jury may award punitive damages either (1) not to exceed the greatest $500,000, (2) twice the amount of actual damages awarded, or (3) "the increased financial benefit to the insurer directly from the conduct causing the injury to the plaintiff and other persons or entities." 23 O.S. § 9.1(C)(2).

As recognized by the court in *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1115 (Okla. 1991), and *Badillo v. Mid-Century Ins. Co., supra*. "The availability of a punitive damage award in a bad faith case is not automatic, but rather, is governed by the standard applicable in other tort cases." The fact that Section 9.1 specifically references insurers does not change this rule. *Badillo* at 1106. Further, even if the evidence is sufficient to justify submission of the bad faith claim to the jury, it is not necessarily sufficient to submit the punitive damages claim because the proof necessary to establish the "reckless disregard" justifying a punitive damage award is greater than the proof required to establish bad faith. *Id.*

According to the Oklahoma Uniform Jury Instructions, the conduct is in reckless disregard of another's rights if the actor "was either aware or did not care that there was a substantial and unnecessary risk that its conduct would cause serious injury" to others.

OUJI-CIV-3d 22.5. There must have been a high probability that the conduct would cause serious harm to another person. *Id.*

The record set forth above cannot support a conclusion that Sentinel's handling of Plaintiff's claim posed a "substantial unnecessary risk" of "serious injury" to Plaintiff, let alone that Sentinel was aware of or indifferent to such risks. The undisputed facts show no evidence of reckless disregard of Plaintiff's rights from which malice or evil intent may be inferred. Therefore, summary judgment should be entered in favor of Sentinel on Plaintiff's punitive damage claim.

Respectfully submitted,

s/ Gerard F. Pignato
Gerard F. Pignato, OBA No. 11473
PIGNATO, COOPER, KOLKER & ROBERSON, P.C.
Robinson Renaissance Building
119 North Robinson Avenue, 11th Floor
Oklahoma City, Oklahoma 73102
Telephone: (405) 606-3333
Facsimile: (405) 606-3334
E-mail: jerry@pclaw.org
**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2014, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Greg D. Givens, Esquire
Sheila R. Benson, Esquire

s/ Gerard F. Pignato
For the Firm